WILLIAM J. DONOHUE, ADMINISTRATOR OF THE ESTATE
OF FRANCIS A. DONOHUE, DECEASED, PLAINTIFF-
APPELLEE, v. THE DELAWARE, LACKAWANNA AND
WESTERN RAILROAD COMPANY, DEFENDANT-APPEL-
LANT.

Submitted May term, 1931—Decided September 28, 1931.

Before Justices CAMPBELL, LLOYD and BODINE.

For the appellant, *Frederic B. Scott.*

For the appellee, *John J. Carlin.*

PER CURIAM.

Plaintiff's decedent was a switchman in the Hoboken yards
of the appellant company, and on July 10th, 1929, while so
engaged was struck and killed by a train of five empty cars
on track 2, pier 7, which had been cut loose from an engine
and were drifting down an incline unattended by a brakeman
or any other person.

Plaintiff brought suit for such death under the Federal
act alleging negligence in his complaint, as follows:

1. Propelled the cars against decedent without warning
which by custom he was entitled to have and expect.

2. Failure of reasonable care as the operation of such cars
was intrusted to incompetent and inexperienced persons.

3. Failure to provide a safe working place and that switches
were improperly constructed.

4. Failure to use proper care in that cars were equipped
with brakes in improper condition.

5. Failure to have a person ride on end of car as was the custom.

6. Lack of reasonable care having due regard to safety of others lawfully upon the tracks.

Plaintiff had a verdict of $20,000 which, upon rule, was by this court reduced to $15,000, and judgment for that amount was entered.

From this the railroad company appeals urging as error admission of testimony of plaintiff's witnesses Kiessling, Kemp and Tamke, and further, that it was error to refuse to direct a verdict.

Plaintiff first called a witness, Herzog, a foreman on a switch engine in the yard, but not connected with the movement of the five cars in question, who testified that at a distance of four hundred feet he saw the peril of the deceased and when the train of cars was within five feet of him he tried to attract his attention so that he could get out of the way and out of danger, but it was too late. He also testified that there was no custom or rule of the yard requiring a brakeman to ride a train of cars such as this that struck decedent. This same witness, on cross-examination, said that during his ten years of service in that yard it was the practice to cut off four or five cars to be shunted without having a man to ride them and give warning.

Plaintiff also called a witness, Harris, who was foreman of the floating drill engine from which the five cars in question were detached. He testified that it was "up to" the discretion of the foreman as to whether a man should ride such a "drift," that is, where the grade requires it or the cars are loaded with material that will be damaged by a hard impact, and he further testified that in his experience in that yard for thirteen years it had never been the custom to put a man on the front "where you shunt cars" such as was being done at the time Donohue was killed.

Thereafter the plaintiff called the witness Kiessling, who testified that he worked for the defendant company in 1918 and had subsequently worked for the Pennsylvania, Lehigh Valley, Erie and Central Railroads, and that he did not

know what, if any, changes had been made in the yard in question since 1918. And he was asked and permitted to answer over objection and exception—

"*Q*. What is the ordinary procedure in case you were shoving five cars from, say track one, to track two, to which an engine was previously attached? *A*. Well, to have a man on the hind end. *Q*. Was that the practice followed by the various railroads on which you worked? *A*. Yes. *Q*. And was that the practice that you and your fellow workers, not only on the Lackawanna, but other roads pursued? *A*. Yes. *Q*. And on the various other roads which you have enumerated? *A*. Yes."

Then plaintiff called a witness, Kemp, who for nine months in 1920 had worked for the defendant company, who was asked and permitted to answer, over objection and exception—

"*Q*. Supposing, for instance, that on July 10th, 1929, you are on a train composed of five cars, and a locomotive was attached to those five cars, and it was desired to move those cars from one track to another location in the yards, what, if anything, was the practice pursued at the time you were in the various railroads to which you have referred? *A*. Well, that is according to the conditions, whether I was foreman, brakeman or groundman—which is the same as brakeman. *Q*. What would you do in relation as to whether or not you would put a brakeman on the car? *A*. If I was foreman it would be up to me. *Q*. What was the practice in the various yards as to what particular notice or warning or anything you would give to other people who might be along the track? *A*. Have a man on the cars to protect the man."

And further, plaintiff called the witness, Tamke, who worked for the defendant from 1914 to 1920 and who had also worked for the Erie, who, among other things, was asked the practice pursued in the Erie yards and also—

"*Q*. Just give us what practice you pursued when you were workng there [defendant company]—what the company pursued when you were working there in regard to shoving cars from one track to another? *A*. Where there is cars to be switched out in case of this kind, where there is four or five

or more cars attached to an engine, I would pursue that whenever I was switching, whatever track I am switching these cars on, to find out if the track is clear, and everything is clear as possible, that there would be no damage to human life or anything else, then I would make sure to see further that there is a man riding these cars to protect whatever would be down on that track."

An examination of the charge of the court reveals that this testimony of these witnesses, Kiessling, Kemp and Tamke, was referred to for the purpose of establishing negligence on the part of the defendant.

We think that the admission of the testimony of these witnesses was error and harmful.

What custom or practice other railroads may have had in their yards under like conditions seems to be immaterial.

No universal rule of care was attempted to be shown. Certainly the opinion of these witnesses was not evidential. Further, those of them who attempted to testify to any custom in the yard of the defendant referred their testimony to many years prior to the happening in question.

There was no proof of any such rule or custom existing and prevailing at the time of the happening, but in fact there was proof through plaintiff's witness, Harris, that no such custom then existed.

We are constrained to think that there was harmful error in the admission of this proof and that there was no proof of negligence aside from it and, therefore, that the trial court erred in refusing to direct the verdict for the defendant.

We think the judgment under review must be reversed, with costs.